MEMORANDUM OF DECISION
This case involves an application for the termination of the parental rights of Beverly N., known as "Binky" to her daughter, Alissa N., who will soon be thirteen years old. Alissa suffers CT Page 7048 from Down's Syndrome and from a debilitating heart defect. She requires constant and highly specialized care. Alissa's maternal grandmother, Beverly A. Z. N., hereinafter referred to as Beverly, filed this application in the Probate Court on April 8, 1996 pursuant to Connecticut General Statutes § 45a-715, et. seq. Also sought in Probate court was the termination of parental rights of the child's father, Nigel McK. On April 8, 1996, the court granted immediate temporary custody of Alissa to her grandmother, and shortly thereafter granted temporary custody and guardianship to her, pending a hearing on the merits of the case. On February 24, 1997, the probate court terminated the parental rights of Nigel McK., having found he had abandoned the child. (S. Hennessey, J.) This termination order has not been appealed to this court and has become final. On June 10, 1997, the probate court ordered the termination of Binky's parental rights to her daughter, which order was timely appealed pursuant to the statutes to the Superior Court for Juvenile Matters.
This appeal thus presents a trial de novo of the issues presented to the court regarding termination of the mother's rights.[2] The application filed by the maternal grandmother, Beverly, alleges that the child was abandoned by her mother and that she had been denied the care, guidance, or control necessary for her physical, educational, moral or emotional well-being as a result of acts of parental commission or omission, pursuant to Connecticut General Statutes § 45a-717(g)(A) and (B). At the commencement of trial, the petitioner moved to amend the application, adding that there was no ongoing parent-child relationship, as had been found by the Probate court. In view of the length of time the allegation had been known to the parties, the court granted the amendment and permitted additional allegations pursuant to CGS § 45a-717(g)(C).
The court finds that the mother has appeared and has a court appointed attorney. The appeal was taken in a timely fashion and in accordance with the statutes. Further, proper notice was served on all parties. The court concludes that it has jurisdiction in this matter and there is no pending action affecting custody of Alissa in any other court.
The court, having heard three days of testimony from the maternal grandmother, the mother, the social worker from the Department of Children and Families, hereafter referred to as "DCF", Karen Brinkman, Dr. Kleinman, the pediatric cardiologist involved with Alissa's present care as well as Attorney Steven CT Page 7049 Ayres, guardian of Alissa's estate and having received three exhibits into evidence, makes the following findings:
Alissa was born on June 10, 1985, the result of a short and abusive relationship Binky had with Nigel McK. She is a Down's Syndrome child and also suffers from Eisenmenger Syndrome, a condition which reduces her life expectancy significantly. Alissa was born with a heart defect, in layman's terms with a hole in her heart, causing pulmonary hypertension and suffers from a wide complex of symptoms, Dr. Kleinman testified. He stated: "such individuals are cyanotic and require careful and regular medical care for their problems. As the disease progresses, iron deficiency can occur, the risk of stroke exists and there can be bone pain, pain in the arms and legs and debilitating headaches." Alissa's disabilities require constant vigilance and supervision; she needs to have oxygen administered during the day in order to function normally. Fortunately for Alissa, her grandmother has been available since her infancy to provide the ongoing care her special medical needs require. While the testimony of her grandmother and her mother differ concerning her early care, both agree that over time during her first year of life, her grandmother began to assume her day-to-day care and responsibility for Alissa's medical condition. The status quo which evolved in Alissa's infancy became the established pattern for Binky, Alissa and Beverly for the years to come.
Binky, when her daughter was born, was barely an adult, just eighteen years old. She lived with her mother, who began to help her with the care of her daughter. Binky testified to how devastated she was to learn about her daughter's condition and health problems. She stated that after the second doctor's visit, she became so depressed with the disturbing diagnosis of her daughter's condition, that she simply could not continue to deal with the child's physicians. She also acknowledged that she was so overwhelmed by her situation and that of her child, that she found it difficult even to hold the infant. She tried to care for her, she testified, and was the primary caretaker for the first six months of the child's life.
Binky was interested in dating and continuing her life as an adolescent, she stated. She became Alissa's primary caretaker, and Binky was happy to let her do so. She also had to make day care arrangements for Alissa when she was an infant as Binky could not be trusted to care for her. CT Page 7050
Except for a period of one and a half years when Binky moved out to live with a boyfriend, all three generations lived together in an apartment from 1985 to 1995. The grandmother devoted her life to Alissa and to the child's educational and medical care needs. Binky participated only tangentially, more as an older sister might, rather than a mother. She would watch Alissa from time to time. She and her mother, starting in 1990, were employed by a local school system, where they each drove school buses. Binky would also see Alissa during the work day, although only her grandmother took Alissa on bus runs. Beverly A.Z.N. made all of the arrangements for Alissa's care, when she could not have the child with her. She, not Binky, provided for Alissa financially.
Alissa's considerable educational needs required much effort by her grandmother to oversee. Alissa needs special education services, due to her cognitive limitations. Beverly A.Z.N. testified to her success in securing Alissa's placement in a regular classroom with a one-on-one aide to help her. Binky, on the other hand, has never participated in the decisions which Alissa's special education needs have necessitated. Binky did testify to her mother's possessiveness when on one occasion Binky received notice of a planned meeting. She stated that she abandoned any desire to attend, because of her mother's attitude. She stated she knew that it affected Alissa when she and her mother fought, so she tried to avoid confrontations. She admitted she was not familiar with the child's teachers and her school progress. She stated that she did not participate in the special education arrangements when all three lived together, leaving it to her mother who was doing a good job with it.
After the first year of Alissa's life, Binky began to take steps to organize her own life. She secured her high school equivalency diploma. Since 1990, she has been employed as a bus driver for a school system, where she is subject to random urine screens to test for drug use. She also has completed training as an emergency medical technician and a volunteer firefighter. She is to be commended for her efforts to overcome her early difficulties. Nonetheless, her efforts never extended to beginning to assume a parental role with Alissa. When requested as Alissa's parent, she signed all authorizations required for the schools and for Alissa's medical treatment. At one time in 1989, her mother sought guardianship of Alissa and Binky voluntarily signed the application. When filed with the Probate court, it turned out to be an incorrect form and no order CT Page 7051 entered. Neither Binky nor Beverly took any action until seven years later to clarify Alissa's legal status, permitting the status quo to continue, with Beverly in the parental and controlling role.
In 1995, however, the family's circumstances began to change. First, a lawsuit had been filed concerning the misdiagnosis of Alissa's heart condition as an infant. There was the possibility of a substantial monetary settlement for Alissa, which began to be paid. Also and in part because of the potential settlement, Beverly and Binky were not getting along. In early April, 1995, Binky moved out of the shared apartment, which had been paid for by Beverly's parents, the child's great grandparents. Alissa did not move with her mother, but remained in the care of her grandmother. Neither Beverly nor Binky appear to have considered the need for a probate court order concerning Alissa's guardianship during this time. Binky saw Alissa daily at work, but did not visit with her or otherwise participate in her life.
During the same time, Beverly did not feel Alissa's medical needs were being properly met by the school system, particularly as it related to her need for oxygen. Sometime before the end of the school year, Beverly removed Alissa from school and cared for her at home.
During the fall of 1995, Beverly and Alissa left the apartment where they had been for years and moved to be closer to Alissa's new medical care providers at the Connecticut Children's Medical Center, Beverly testified. Alissa was enrolled in the new school system after some months where her education was monitored by a planning and placement team which met on a regular basis to evaluate the child's progress. Sandra Dring, the school team coordinator, testified that when in this placement, the school made arrangements to begin to teach Alissa the fundamentals of reading. She stated that she found the dedication and involvement of Alissa's grandmother in the child's care to be superb, "ten plus on a scale of one to ten." However, because of the school system's lack of familiarity with Alissa, she was not main streamed there, but placed full time in a special education setting.
Alissa's stay in this new location near Hartford was short lived as the majority of her medical care in 1997 began to be provided at Yale. Beverly and Alissa moved again to a new location, closer to New Haven. Alissa had yet another change in CT Page 7052 her environment, her school and her living situation. Nonetheless, her grandmother noted, the new school system has made excellent arrangements for her needs.
From Binky's perspective, her mother's move was extremely upsetting. Her mother did not tell her that she and Alissa were moving or their new location. She did not for some months have her address or phone number and was advised by counsel in the medical malpractice suit that it would be unwise to see Alissa. She admitted that when the application for temporary guardianship and termination of parental rights was filed, she did not contest the guardianship order for her mother. She appears to have acquiesced in the status quo once again, hoping that it would blow over. She stated that she and her mother had disagreements in the past when they would not speak to each other for long periods of time. She thought this time too that it would end and she would be able to see Alissa. But events did not follow the usual course; the consequence of her estrangement with her mother has resulted in her not seeing Alissa since November of 1995, when her mother stopped working at the bus company where Binky continues to be employed.
Karen Brinkman, a DCF social worker, prepared the mandated social study for the Probate court and testified. She stated that her investigation revealed that Binky had abandoned her daughter and that there is no ongoing parent-child relationship. She found that Binky was not, in December of 1996, in a position to make a home for her child. She recommended termination of parental rights and adoption of Alissa by her grandmother.
Steven Ayres, the guardian of Alissa's estate, appointed by the Probate Court, testified to his involvement in the matter. He was appointed as guardian after Beverly N. fired the attorneys handling the medical malpractice case for Alissa and failed to hire replacement counsel, even after directed to do so by the court. He testified to the difficulties Mrs. N. caused in the prosecution of the case. Her whereabouts were unknown, he stated, for about five months in 1995, until he learned of the inquiry from the Rocky Hill school system about Alissa's school records. He also expressed concern when he discovered that Alissa's medical insurance had lapsed in 1996, apparently due to inattention by Beverly. He stated that Alissa's tremendous medical care needs made medical insurance an absolute necessity for her. Despite the problems has had with Beverly and her strong-willed behaviors, he stated that Alissa's grandmother has CT Page 7053 done a good job taking care of the child. Alissa's "quality of life is amazingly good, considering the troubles she has had in her brief life so far."
Attorney Ayres also testified to his observations of Alissa and Binky. He described a meeting in 1994 in probate court while waiting to be heard by the court. Beverly had left and he, Alissa, and Binky were waiting. Binky's behavior with Alissa was appropriate, he stated. Binky gave Alissa some paper and she drew a picture for him. He did not see anything out of the ordinary and he thought that they interacted as mother and daughter. He also wrote a letter to the probate court in which the termination proceedings were held. His recommendations were based on his involvement in the matter, his knowledge of the history of the family, and his observations as a human being and a father himself. He did not claim any expert status. Attorney Ayres stated that his recommendations to the court were that: the father's rights to Alissa be terminated; the grandmother be appointed guardian of the person of the child; visitation rights be granted to Binky and that termination not be granted. He did not see the need to eliminate Binky from Alissa's life.
Attorney Ayres was not the only individual experiencing difficulties in dealing with Beverly. The problems Beverly has cooperating with others who have some authority in her life and in Alissa's life also came briefly to light in the testimony of Dr. Kleinman. Dr. Kleinman testified that he had met Alissa for an evaluation when she was 2 1/2. He became her primary treating cardiologist from 1992 until 1995, when Alissa's care was abruptly transferred to Hartford and about two years later, Alissa again came to be in the care of the Yale group. The cause of Beverly leaving was that Dr. Kleinman had been subpoenaed to testify in a pending case and Beverly had directed him not to comply. He could not take such action and so the child's medical care was altered precipitously, for non-medical reasons.
Such precipitous and unsettling behaviors were also exhibited by Beverly in the move to Rocky Hill, where she and Alissa lived in a motel for some months before securing a more permanent location. As noted, Beverly removed Alissa from the school system where she had been for some years and where her problems were well-known to a totally new environment. Binky testified that her mother failed to cooperate with the old system; that medical protocols for Alissa could have been prescribed by the child's treating physician and then implemented by the fire marshal, a CT Page 7054 step Beverly refused to take. Her solution was to uproot the child and take her to an unknown environment.
Dr. Kleinman testified, however, to the excellent care provided Alissa. When she was first diagnosed, Beverly took all steps to become familiar with and secure information about Alissa's several conditions. In the years she has brought her granddaughter to their group, he and his assistants have found Beverly to be consistent in meeting Alissa's care needs. Her emergency calls, he stated, were made appropriately and they were not troubled by panic calls. Dr. Kleinman also testified to the need for stability in the child's life. Where an individual has "pulmonary hypertension and is quite cyanotic, which is the case with Alissa, great emotional upheaval is strongly discouraged for such patients. It can be associated with wide swings in blood pressure and because she has a wide open hole in her heart, any change in blood pressure to the body is immediately transmitted as an extremely high surge of blood to her vessels." When questioned about visitation with Binky, he stated he did not have enough information to know how this would effect Alissa. He stated that it would be to the "child's benefit for there not to be upheaval, that it has the potential for causing a deterioration in her condition." In general, he stated that he would discourage activity which is likely to be upsetting to the child." He noted, however, that at some point the child's own attitudes enter the picture.
 ADJUDICATION
Alissa has a loving and totally dedicated parent, one who is so in all but biological fact; her grandmother, Beverly. No one disputes that this is so, including the child's biological mother, Binky. Beverly has been the child's psycholgical parent since her first year of life and has provided this special needs child with the care and love she needed to flourish. The court finds, by clear and convincing evidence, that as of April 10, 1996, Alissa had been abandoned by her biological mother, Binky as she had not maintained a reasonable degree of interest, concern or responsibility for Alissa. "A parent must maintain a reasonable degree of interest in the welfare of his or her child. `Maintain' implies a continuing reasonable degree of concern." InRe Michael M., 29 Conn. App. 112, 614 A.2d 832 (1992) quoting InRe Rayna M., 3 Conn. App. 23, 37-38, 534 A.2d 897 (1987).
Binky was a daily presence in Alissa's life until November of CT Page 7055 1995, but not in the role of a caretaker or mother. She is understandably upset at the prospect of losing all touch with her daughter, but had not been able to successfully take the steps necessary to play a role in the child's life as of April 8, 1996. She did not provide for her financially, emotionally or otherwise. She did not exhibit the level of concern and care a parent has for a dependent child. She had acquiesced in the assumption of that role in Alissa's life by her own mother, Beverly. In legal terms, she has abandoned the child.[3]
The court also finds from the clear and convincing evidence that there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent child relationship would be detrimental to the best interest of the child. In considering the facts on this point, our courts have held:
 "The question is whether they [the facts] substantiate a finding by clear and convincing evidence that no relationship ever existed between the parent and child, or that the relationship has terminated, without any future hope for its establishment or reestablishment." (Internal brackets added.) In re Migdalia M., 6 Conn. App. 194, 211, 504 A.2d 532 (1986); In re Juvenile Appeal (84-3), 1 Conn. App. 463, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984); In re Juvenile Appeal (Anonymous), 177 Conn. 648, 670-671, 420 A.2d 875 (1979).
Binky and Alissa never had a parent-child relationship, or if they did, it ended before the child was a year old. There is no indication that Binky is able to assume that role now, despite her statements to the contrary. She was not ready to assume that role in April of 1995, when she moved from the shared apartment with her mother leaving Alissa behind. Given her difficulties in accepting this handicapped child, Alissa was fortunate in the love her grandmother has demonstrated for her throughout her life. The court further finds such circumstances had existed for an extended period of time in excess of one year prior to the date of the filing of the application for termination of parental rights in the Probate Court. CT Page 7056
While it can be argued that Binky's absence from Alissa's life in 1995 and 1996 was in part caused by Beverly's behavior in preventing her from seeing the child, such behavior does not negate the fact that Binky herself moved out in April of 1995, leaving Alissa in her mother's care. She was not a parent to this child, exhibiting, love, affection, concern and care or providing financial support and she did not have an ongoing parent child relationship with Alissa.
As to the third ground alleged, the court finds that the evidence has not proven that Alissa has denied, by reason of acts of parental omission as well as commission, the care, guidance or control necessary for her physical, educational, moral and emotional well being as set forth in Connecticut General Statutes § 45a-717(g)(2)(B). In a gradual process, while she was an infant, Alissa came to be cared for exclusively by her grandmother. She does not view and does not know Binky as her mother and calls her by her nickname "Binky". The court cannot conclude from these facts that the child has suffered great emotional harm, as required by the case law interpreting this section of the statutory requirements for termination. Alissa has the care of a grandmother who loves her as her own child and her biological mother did not stand in the way of the development of that bond. In re Kelly S., 29 Conn. App. 600, 614, 616 A.2d 1161
(1992), In re Sean H., 24 Conn. App. 135, 144-145, 586 A.2d 1171, cert. denied, 218 Conn. 904, 588 A.2d 1078 (1991).
 REQUIRED FINDINGS
With respect to the mandatory factual findings required by Connecticut General Statutes § 45(a)-717(I) concerning the mother, Binky:
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by a child placing agency to facilitate the reunion of the parent with the child;
Since no such agency has been involved with this family, no such finding can be made. Certainly, Binky did not seek such services to assist her as a young mother, and now, she knows and admits that Alissa is closely bonded to her grandmother who has provided most of her care.
2) The terms of any applicable court order entered into and CT Page 7057 agreed upon by any individual or child placing agency and the parent and the extent to which all parties have fulfilled their obligations under such order;
There were no such orders entered.
3) The feelings and emotional ties of the child with respect to the child's parents, any guardian of the child's person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties;
As previously noted, Alissa considers her grandmother to be her mother and is very attached to her. Her feelings about her mother are as to an acquaintance, at best.
4) The age of the child;
Alissa is thirteen years old as of June 10, 1998.
5) The efforts the parent has made to adjust such parent's circumstances, conduct or conditions to make it in the best interests of the child to return the child to the parent's home in the foreseeable future including but not limited to (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child. Binky had, as of April 10, 1996, made no serious attempts to remain in contact with her daughter, despite her expressed wishes before the court now. She has acquiesced in her mother's control over the child during the child's entire life and that conduct has not changed during these many years. The court finds that the mother has been unsuccessful in making any meaningful attempt to adjust her circumstances, conduct or condition to facilitate reunification. She has had no contact with Alissa in over a year.
(6) The extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstance of the parent. While it is clear that Beverly has prevented Binky from having contact with Alissa and that such CT Page 7058 conduct is not supported as being in the best interests of Alissa, nonetheless it is also the case that Binky had done nothing to correct the situation. Even before Alissa's move from the apartment in which the three had lived, Binky had moved out herself, making no plans to take the child with her or to provide for her.
 DISPOSITION
In a termination of parental rights case, the court must first determine whether the grounds for termination of parental rights have been proven by clear and convincing evidence. Only after this step has been completed, can the court consider what disposition is in the best interests of the child. The need to separate the evidence in a termination of parental rights case into two phases, those facts supporting adjudication and then those facts bearing on the appropriate disposition, have been repeated often by our courts. "Our statutes and case law make it crystal clear that the determination of the child's best interests comes into play only after statutory grounds for termination of parental rights have been established by clear and convincing evidence." In re Valerie D., 223 Conn. 492, 511,613 A.2d 478 (1992).
This is a case that turns upon the question of Alissa's best interests. Unresolved by all of the previous findings is what is in Alissa's best interests, about which the court took no expert testimony. Alissa continues to live with her grandmother, her primary caretaker since infancy. All those who testified without exception, including Binky, acknowledged the bond between Alissa and Beverly. Beverly's care for Alissa has, for the most part, been exemplary. She is able to accurately assess the child's medical needs and secure the assistance the child requires. There is no doubt that it is in Alissa's best interests that her grandmother should have the legal right to provide for the child's medical care, schooling and other needs. But unclarified by the social study, by the testimony of the primary witnesses and by counsel is why it is would be in Alissa's best interests to sever her legal connection to her mother.
There are circumstances where parents, through various acts, have lost their connection to their children and new connections are in the process of being established by their children with others. For these children, permanency is necessary and a continued, even limited connection to their biological parents CT Page 7059 can and does disrupt such permanency. Permanency is also desirable for Alissa, but she has had such permanency with the continued and assured care from her grandmother since infancy. There is no parental connection which previously existed and has now been disrupted. Seeing her mother will not prevent or inhibit the primary attachment Alissa has to her grandmother. For a child whose future is uncertain and whose care requirements are extraordinary, the more people who know about her and are concerned about her, the better. While Binky's concern has not risen to the level of that of a parent, neither is it non-existent. As of 1994, Attorney Ayres attested to its appropriateness.
The court understands without a termination of parental rights, there is the possibility of continued litigation concerning Alissa. But given past history, any serious challenge to Beverly's right to continue to be Alissa s parent in all but biological fact is remote and unlikely. The evidence is too overwhelming in support of Beverly's claim to her parental role in Alissa's life. Alissa's primary connection to her is unquestioned.
The court is also mindful of the fact that the loss of contact between Binky and Alissa since 1995 has been in large measure due to Beverly's conduct. Beverly exercised some questionable and precipitous judgments in 1995 and 1996 with her move from the city in which she had resided for many years. Fortunately her decision to abruptly leave Dr. Kleinman's group did not impair the child's medical care. What is clear is that her move to the greater Hartford area and the required change of doctors and schools did introduce upheaval to Alissa's life, which Alissa appears to have weathered without untoward incident and medical consequences. It was during the time of these abrupt decisions, which may not have been in Alissa's best interests, that Beverly also severed the limited connection Binky had to her daughter.
There has been no evidence that Binky's limited contact with her daughter was unpleasant or harmful to the child. What is abundantly obvious is that such contact was unwanted by Beverly. There is also no question that Binky did not exhibit the concern which would ordinarily be exhibited by a parent, but she did exhibit some concern. As the court has noted, her involvement is more akin to an acquaintance or an older sibling. Alissa does not benefit from being totally isolated from all those family members CT Page 7060 previously connected to her. Alissa can benefit from having her mother remain a visiting resource.
The court cannot conclude, from the evidence, that it is in Alissa's best interests to terminate the parental rights of her mother to her. Neither can the court conclude, in the face of the overwhelming evidence to the contrary, that Alissa's best interests would be served by permitting Alissa to live with her mother, who has done nothing to assume a responsible parental role. The court concludes that the best interests of Alissa are best met by Alissa's continued care by her grandmother, Beverly. The court therefore awards guardianship of Alissa to Beverly, understanding that others serve as the guardians of the child's estate.
From the evidence, the court concludes that the connection between Alissa and Binky should be resumed. Toward that end, the court orders that Binky be permitted the visitation set forth below. Once established, the court notes that the schedule set forth is a basic and minimal one which the parties should modify, alter and increase from time to time as may be in Alissa's best interests. As communication between them will be necessary to assure beneficial visits for Alissa, the court directs each to set aside their past differences and start their relationship anew, focusing on Alissa and her needs.
 VISITATION ORDERS
In order to facilitate the establishment of visitation in an unobtrusive and non-disruptive manner for Alissa, the court directs that Alissa's guardian, at her expense, retain an employee of SARAH Seneca at 11 Business Park Drive in Branford or of another suitable agency involved in providing services to special needs children such as Alissa. The function of the SARAH employee shall be as a neutral observer and visitation facilitator during the first three in-home visits that the court has ordered and as set forth below. Further, the court directs that the services of the SARAH or equivalent professionals be utilized by Beverly and Binky in the event of any disputes concerning visitation, prior to either party returning to court concerning such visitation. The court further directs that a copy of this decree be provided to any professional providing assistance to the parties concerning visitation.
Visitation between Alissa and Binky shall be once a month, on CT Page 7061 the first Saturday of each month. The first three visits shall take place at Alissa's home, supervised by Beverly and shall be for a period of one hour. Beverly shall, during these months, provide Binky with necessary medical information, phone numbers and the like for Alissa. As Binky has trained as an emergency medical technician, there is no doubt in the court's mind that she is able to provide emergency care for Alissa during visitation, should that need arise. But to provide such care, she must have the necessary medical information, which Beverly shall provide. After the expiration of three months, visitation will continue once a month; on the fourth month, Binky may have Alissa in her sole care and may leave the residence for one hour, on the fifth month for two hours and then on the sixth month for three hours. Visitation will continue thereafter on the first Saturday of each month for a period of three hours unsupervised.
The court notes that activities to be undertaken with Alissa should be those suited to the child's interest and activity level.
In the event problems develop which require court intervention during the next twelve months, this court will reserve jurisdiction to hear the matter.
Barbara M. Quinn, Judge Child Protection Session
[2] Connecticut General Statutes § 45a-186 et. seq.
[3] This adjudication may have implications for grandmother, daughter and granddaughter in that it affects the intestacy inheritance rights as set forth in Connecticut General Statutes § 45a-439.